UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

SANDRA SCHULZE, individually, as guardian ad litem of minor child E.S., and as Special Administrator of the ESTATE OF JON D. SCHULZE; MAKALYA SCHULZE; GAHVIN SCHULZE; VICTORIA MARTIN; KALI WOOD-SMITH; and SEBASTIAN GROTT

Plaintiffs,

v.

DOUGLAS COUNTY, a political subdivision of the State of Nevada; MATT SAMPSON, DEPUTY SHERIFF II, DOUGLAS COUNTY SHERIFF'S OFFICE; DOES 1-10,

Defendants.

Case No. 3:23-cv-567-ART-CLB

ORDER ON MOTION FOR SUMMARY JUDGMENT (ECF No. 36)

Plaintiffs Sandra Schulze, individually; as guardian ad litem of minor child E.S.; and as Special Administrator of the Estate of Jon D. Schulze; Makayla Schulze, Gavin Schulze, Victoria Martin, Kali Wood-Smith, and Sebastian Grotts ("Plaintiffs") bring this suit against Deputy Sheriff Matt Sampson, Douglas County, and the Douglas County Sheriff's Office ("Defendants") under 42. U.S.C. § 1983 for a violation of Mr. Schulze's substantive due process and under Nevada state law for wrongful death and negligent infliction of emotional distress arising out of a high-speed police pursuit on November 16, 2021, that resulted in a fatal crash between Mr. Schulze and an unassociated driver. Before the Court is Defendants' Motion for Summary Judgment. (ECF No. 36.)

I.    **FACTUAL BACKGROUND**

On November 16, 2021, Deputy Matt Sampson of the Douglas County Sheriff's Office ("DCSO") was off duty, driving home from Instructor Development

1

training in his marked patrol vehicle. (ECF Nos. 36 at 4, 36-2 at 1.) Because he was off duty, Deputy Sampson was not wearing a body-worn camera or logged into the DCSO mobile computer system. (ECF No. 36-4 at 16.) DCSO vehicle policy says that off-duty deputies "shall not take enforcement action unless absolutely necessary to protect the life or safety or another (i.e. crimes against persons or obviously intoxicated drivers)." (ECF No. 45-2, Vehicles – Sheriff's Office, Policy 9.480.)

That same afternoon, Blake Thacker picked up Jon Schulze to run an errand at 7-11. (ECF No. 36-2 at 1.) Mr. Schulze sat in the passenger seat not wearing his seatbelt. (ECF No. 45-4 at 82.) While driving eastbound on Bluerock Drive, Deputy Sampson observed Mr. Thacker in his white lifted Jeep on Leonard Drive. (ECF No. 36-2 at 1.) He knew that there was a felony warrant out for Mr. Thacker's arrest, because the DCSO had been actively trying to apprehend him for approximately two weeks. (ECF No. 45-4 at 11.) Deputy Sampson was aware that Mr. Thacker was on probation for battery on a police officer and that "he has known to be heavily involved in the sales and/or use of narcotics." (*Id.* at 29.)

The parties dispute whether Deputy Sampson observed Mr. Thacker run the stop sign when turning right from Leonard Road onto Bluerock Road, behind Deputy Sampson. (*Id;* ECF Nos. 45 at 8; 45-8 at 3.) They also dispute whether Deputy Sampson watched the Jeep traveling east behind him until he noticed Mr. Thacker make a U-turn that Deputy Sampson alleges was "aggressive" and "proceed north on Robin Drive at a high rate of speed." (ECF No. 36-2 at 2.) Deputy Sampson then made a U-turn to look for the Jeep "so that he could report its location to patrol deputies." (*Id*; ECF No. 45-4 at 5.)

Deputy Sampson stated in his affidavit that he did not see Mr. Thacker again until he approached the intersection of Robin Drive and Kimmerling Road, where he saw the Jeep traveling at a high rate of speed, estimated to be seventy miles per hour in a twenty-five mile an hour zone. (ECF No. 36-2 at 2.) Upon

seeing Deputy Sampson come up behind him, Mr. Thacker sped away, driving west down Kimmerling. (ECF No. 45-8 at 4.) The parties dispute the manner in which Mr. Thacker fled from Deputy Sampson, outside of speeding. Deputy Sampson claims that Mr. Thacker was driving erratically and witnessed him try to push another car off the road. (ECF No. 36-2 at 2.) Mr. Thacker claims that at the time Deputy Sampson approached him, "he was not speeding or driving recklessly." (ECF No. 45-8 at 6.) Deputy Sampson alleges that at this point, he turned on his emergency overhead lights and siren and attempted to catch up to the Jeep. (*Id.*) The Carson City Sheriff's Office Investigation Report corroborates this timing with the testimony of several neighbors that saw lights and sirens. (ECF No. 45-4 at 167, 173.) Plaintiffs dispute the exact time that Deputy Sampson turned on his lights and sirens. (ECF No. 45-8 at 6.)

Ms. Schulze called Mr. Schulze at approximately 4:43 P.M, as Mr. Thacker attempted to turn left back onto Robin Drive. (ECF No. 45-22 at 9:00.) She heard him yell "just pull the fuck over. Just pull over and let me the fuck out," before the phone went dead. (ECF No. 36-5 at 6.) Mr. Thacker then lost control and rolled his Jeep, landing back on his wheels. (ECF No. 45-8 at 4.) Deputy Sampson arrived at the intersection after he had rolled, and positioned his patrol vehicle at an angle, blocking Mr. Thacker's path, and began to exit his vehicle with his gun pointed towards Mr. Thacker. (ECF Nos. 36-2 at 2; 45-8 at 4.) Mr. Thacker drove towards Deputy Sampson and around his vehicle over the sidewalk and through the yard of a neighboring home. (*Id.*) The parties dispute whether this action was an attempt or threat to ram Deputy Sampson. (*Id.*)

Deputy Sampson continued the pursuit after Mr. Thacker drove past him onto Tillman Lane. (ECF No. 36-2 at 4.) Deputy Sampson believes that Mr. Thacker was traveling over sixty miles per hour, and that when he tried to turn, the Jeep's wheels came off the ground. (*Id.*) Mr. Thacker eventually crossed over the double-yellow lines on Tillman Lane and drove southbound in the

northbound lane. (*Id.*) A vehicle, later identified to be driven by sixteen-year-old Brooke Lopez, was in the northbound lane and signaling to turn left towards Patricia Drive. (*Id*; ECF No. 45-4 at 20.) The front passenger side of Mr. Thacker's Jeep struck the front driver side of the vehicle, and the Jeep rolled several times down Tillman Lane. (*Id.*) Jon Schulze was ejected from the Jeep as it rolled, and he died at the scene. (*Id.*)

Mr. Thacker pled guilty to a violation of NRS 484B.550(4) for causing the death of Jon Schulze while attempting to elude a police officer. (ECF No. 36-6.)

At the time of the incident, DCSO had a vehicle pursuit policy, Policy 9.465, and a vehicle operation policy, Policy 9.460, in place. (ECF No. 45-10.) Nevada law also provides how officers should drive during emergencies and pursuits. NRS 484B.700.

## II.    LEGAL STANDARD

A "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are drawn in the nonmovant's favor. *See id.* at 255. Nevertheless, when a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). And when the facts at issue are unambiguously captured in a video recording, courts view the "facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380-81.

### III.  DISCUSSION

#### a.  Section 1983 Violation of Due Process and Unlawful Seizure

In their reply, Plaintiffs concede that they are pursuing their section 1983 claim on a theory of a violation of substantive due process and not unlawful search and seizure. *See County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) ("a police pursuit in attempting to seize a person does not amount to a "seizure" within the meaning of the Fourth Amendment."). Therefore, the Court will only analyze their claim under a theory of due process.

#### i.  Qualified Immunity

In their motion for summary judgment, Defendants argue that they did not violate Mr. Schulze's constitutional rights and are entitled to qualified immunity. (ECF No. 36).

Qualified immunity is not merely an immunity from liability, but also an immunity from suit. *Hunter v. Bryant*, 502 U.S. 224, 227-28 (1991); *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F.3d 1095, 1098–99 (9th Cir. 1995). The doctrine of qualified immunity balances two important interests: "the need to hold public officials accountable when they exercise power irresponsibly" against "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The qualified immunity defense allows for mistaken judgments and protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* In so doing, it protects public officials "'from undue interference with their duties and from potentially disabling threats of liability.'" *Elder v. Holloway*, 510 U.S. 510, 514 (1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)).

The Supreme Court has set forth a two-part analysis for resolving government officials' qualified immunity claims. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Under the *Saucier* analysis, "[q]ualified immunity protects government officials from liability under § 1983 unless (1) they violated a federal

statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Cuevas v. City of Tulare*, 107 F.4th 894, 898 (9th Cir. 2024) (internal quotation marks and citations omitted). In the first step of the process, the court considers whether the facts "[t]aken in the light most favorable to the party asserting the injury . . . show [that] the [defendant's] conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201. In the second, the court determines whether the right was clearly established at the time of the alleged violation. *Id.* A right is clearly established if, at the time of the challenged conduct, "every reasonable official would have understood that what he [was] doing violate[d] that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citations and quotations omitted). "This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." *Hunter*, 502 U.S. at 229.

### 1. **Constitutional Violation**

Defendants argue that the Supreme Court's decision in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998) compels the conclusion that Deputy Sampson did not violate Mr. Schulze's rights because he did not act with the intent to harm that is shocking to the conscience when he conducted his pursuit. Plaintiffs contend that Deputy Sampson had an opportunity to deliberate his choices and should therefore be held to a deliberate indifference standard.

In *Lewis*, the Supreme Court held that "high-speed police chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressable by an action under § 1983." *Id.* In order to prove a due process violation, an injured bystander "must show that the behavior of the police in his case meets the *Lewis* standard and 'shocks the conscience.'" *Bingue v. Prunchak*, 512 F.3d 1169, 1175 (cleaned up) (citing *Onossian v. Block*, 175 F.3d 1169, 1171 (9th Cir. 1999)). While there are generally two tests to measure conscience-shocking conduct, under deliberate

indifference or purpose to harm, the Ninth Circuit applies the intent to harm test "to all high-speed chases." *Estate of Soakai v. Abdelaziz,* 137 F.4th 969, 976 (9th Cir. 2025) (internal citations omitted).

Under the intent to harm test, an officer violates substantive due process only if they act with the purpose to harm a civilian for reasons "unrelated to the legitimate law enforcement objectives of arrest, self-defense, or the defense of others." *Abdelaziz,* 137 F.4th at 977 (citing *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 454 (9th Cir. 2013)). The intent to harm is subjective, and a court employing the test will not second-guess an officer's decision—even if seemingly ill-advised in hindsight—if the officer "acts with a legitimate purpose ... in mind." *Id.* (citing *Tan Lam v. City of Los Banos*, 976 F.3d 986, 1003-04 (9th Cir. 2020)).

There is no requisite intent to harm that shocks the conscience in this case. In *Lewis*, officers responding to an unrelated incident saw a motorcycle drive past them at high speed. *Lewis*, 523 U.S. at 836. An officer ordered them to stop and turned on warning lights. *Id.* When they did not stop, the officer turned on his emergency lights and sirens and pursued them at high speed for 75 seconds over a course of 1.3 miles in a residential neighborhood, weaving in and out of traffic at speeds of up to 100 miles an hour with the officer following at a distance as short as 100 feet. *Id.* When the motorcycle attempted a sharp left turn, the motorcycle's passenger was flung in the path of the patrol car, hit at approximately 40 miles per hour, and pronounced dead at the scene. *Id.* The officer had disregarded the Sacramento County Sheriff's Department's General Order on police pursuits by failing to consider whether the chase was warranted and weighing the hazards compared to the benefit of immediate apprehension. *Id.* at 838.

The Supreme Court held the officer had done nothing to cause the high-speed driving, nothing to excuse the driver's flouting of commonly understood law enforcement authority to control traffic, and nothing (beyond a refusal to call

off the chase) to encourage him to race through traffic. *Id.* at 855. Therefore, "while prudence would have repressed the reaction, the officer's instinct was to do his job as a law enforcement officer, not to induce [the driver's] lawlessness, or to terrorize, cause harm, or kill," and did not shock the conscience. *Id.*

The facts of *Lewis* point to a finding that Deputy Sampson did not initiate and maintain his pursuit with the requisite intent to harm. While the officer in *Lewis* pursued two young people with no relevant criminal background, Deputy Sampson was aware that Mr. Thacker had a felony warrant for his arrest. Both were in residential areas, with pursuits at high speeds. Both officers technically acted counter to their department policy. The Ninth Circuit still maintained that the officer's actions did not violate the victim's substantive due process. *Lewis*, 523 U.S. 855.

Plaintiffs suggest the several-minute duration of the chase indicates that Deputy Sampson should have re-evaluated his pursuit. But the Ninth Circuit has held that "high-speed police chases, by their very nature, do not give the officers involved adequate time to deliberate in either deciding to join the chase or how to drive while in pursuit of the fleeing suspect." *Bingue*, 512 F.3d at 1177. Neither does Plaintiffs' argument claiming that Mr. Schulze status as a bystander makes Deputy Sampson's actions more reckless hold up against Ninth Circuit law, which has held "if a police officer is justified in giving chase, that justification insulates the officer from constitutional attack, irrespective of who might be harmed or killed as a consequence of the chase." *Onossian*, 175 F.3d at 1171. Similarly, the fact that Mr. Thacker had a general fear of the aggressive tactics of the DCSO does not establish that Deputy Sampson had an intent to harm him during the pursuit. (ECF No. 45 at 14.) Statements by fellow officers after the chase checking in on Deputy Sampson, asking, "you good?" after the pursuit do not indicate any intent to harm, either. (ECF No. 45-19 at 13:15-13:30); *see also Abdelaziz*, 137 F.4th at 975 (finding that officers commenting that they were

"satisfied" that the suspect "appeared injured" established intent to harm).

Here, Deputy Sampson immediately recognized Mr. Thacker and his white Jeep, and knew there was a felony warrant for his arrest and that the DCSO was actively pursuing him. (ECF No. 36-2 at 3.) Although his decision to initiate a pursuit may have been contrary to DCSO guidelines, he acted with a legitimate law enforcement purpose and without an intent to harm Mr. Thacker. The Court therefore grants summary judgment to Defendants on Plaintiff's section 1983 claim under substantive due process.

### ii. *Monell* **Liability**

Defendants argue that the Douglas County is entitled to judgment as a matter of law because there was no underlying violation of Plaintiff's constitutional rights that could have been influenced by a policy or custom. The Court agrees.

A municipality may be liable for actions resulting in violations of constitutional rights only when performed pursuant to a government policy or custom. *Monell v. Department of Social Services*, 436 U.S. 658 (1978.) To establish liability, a plaintiff must show (1) he was deprived of a constitutional right; (2) the municipality has a policy; (3) the policy amounts to deliberate indifference to plaintiff's constitutional rights; and (4) the policy is the moving force behind the constitutional violation. *Oviatt v. Pearce,* 954 F.2d 1470, 1474 (9th Cir.1992). Because Plaintiffs have not shown that Mr. Schulze was deprived of a constitutional right, they have not met the first *Monell* requirement. Therefore, Douglas County cannot be held liable under section 1983.

### b. **Wrongful Act or Negligence Resulting in Wrongful Death, NRS 41.085**

#### i. **Discretionary Act Immunity**

Defendants argue that it should not be liable for the death of Mr. Schulze under a theory of wrongful death because Officer Sampson's actions and Douglas

County policy on vehicle pursuits are protected by discretionary act immunity.

NRS 41.032 provides immunity to contractors, officers, employees, agents, and political subdivisions of the State based upon the performance or failure to perform a discretionary function or duty. *Davis v. City of Las Vegas*, 478 F.3d 1048, 1059-60 (9th Cir. 2007). The Supreme Court of Nevada has "adopted the *Berkovitz-Gaubert* test enunciated by the United States Supreme Court for determining whether acts fall within the scope of discretionary-act immunity." *Paulos v. FCH1, LLC*, 456 P.3d 589, 595 (Nev. 2020) (en banc) (citing *Martinez v. Maruszczak*, 168 P.3d 720 (Nev. 2007) (en banc)). To give rise to discretionary act immunity, the conduct at issue "must (1) involve an element of individual judgment or choice and (2) be based on considerations of social, economic, or political policy." *Est. of Wilson by Wilson v. Las Vegas Metro. Police Dep't*, No. 2:18-cv-01702-APG-VCF, 2020 WL 6930099 (D. Nev. Nov. 24, 2020) (citing *Paulos*, 456 P.3d at 595). "The focus of the second criterion's inquiry is not on the employee's 'subjective intent in exercising the discretion conferred by the statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis.'" *Martinez*, 168 P.3d at 728.

Whether discretionary-act immunity applies to a particular official's actions presents a mixed question of law and fact. *Id.* at 724.

### 1. **Deputy Sampson**

The central dispute between the parties is how to define Deputy Sampson's acts and which acts are most relevant under step two of the inquiry. "A critical preliminary step in the discretionary-act immunity analysis is identifying the specific government action challenged before turning to the *Berkovitz-Gaubert* test." *Glover-Armont v. Cargile*, 426 P.3d 45, 51 (Nev. 2018) (holding that discretionary immunity does not apply where police officer had a duty to drive safely under NRS 484B.700). Defendants analogize Deputy Sampson's decision to initiate and pursue Mr. Thacker to the discretion to detain and arrest a

suspect, which is protected under discretionary act immunity. *See Napouk v. Las Vegas Metro. Police Dep't.*, 669 F. Supp. 3d 1031, 1046 (D. Nev. 2023); *Est. of Cavanaugh by Cavanaugh v. Andrade*, 550 N.W.2d 103, 114 n.11 (Wis. 1996) (an officer's decision to initiate and continue a high-speed pursuit is a discretionary act subject to immunity) (collecting cases). Plaintiffs refer to the chase itself, or "the speed, wrong-way following, continuation after loss of sight, and failure to terminate," as "operational implementation" of Nevada state policy prescribing how an officer can operate an emergency vehicle, and therefore subject to negligence review. *See* NRS 484B.700; (ECF Nos. 6 at 6, 45 at 36.)

The Nevada Court of Appeals has held that NRS 484B.700 does not afford discretion in the manner that an officer must operate a vehicle during an emergency or pursuit. *Glover-Armont*, 426 P.3d at 54. Because Plaintiffs are challenging the method of the pursuit, rather than the decision to initiate, Deputy Sampson's acts are not subject to discretionary act immunity.

### ii. **Douglas County**

Plaintiffs also seek to hold Douglas County liable for failing to adequately train officers to implement policies during high-speed pursuits. (ECF No. 6 at 7.) "Decisions about whether to hire and how to properly train and supervise an officer involve individual judgment on the part of the policymakers or supervisors and are based on consideration of social, economic, or political policy." *Estate of Wilson*, 2020 WL 6930099, at *9 (citing *Paulos*, 456 P.3d at 596). Douglas County's actions were not made in bad faith nor in violation of the Constitution. *See Falline v. GNLV Corp.*, 823 P.2d 888, 891 (Nev. 1991); *Mirmehdi v. United States*, 689 F.3d 975, 984 (9th Cir. 2011). Therefore, Douglas County is subject to discretionary act immunity.

### iii. **Wrongful Death**

Under Nevada's wrongful death statute, a wrongful death claim must be based on some negligence or other wrongful act that causes the death of the

11

decedent. *Ansara v. Maldonado*, 647 F. Supp. 3d 958, 983 (D. Nev. 2022); NRS 41.085. A negligence claim under Nevada law requires the plaintiff to show "(1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; (3) the breach was the legal cause of the plaintiff's injury; and (4) the plaintiff suffered damages." *Scialabba v. Brandise Constr. Co.*, 112 Nev. 965, 921 P.2d 928, 930 (1996). Nevada state courts are "reluctant to affirm summary judgment in negligence cases because, generally, the question of whether a defendant was negligent in a particular situation is a question of fact for the jury to resolve." *Butler ex rel. Biller v. Bayer*, 168 P.3d 1055, 1064 (Nev. 2007).

Plaintiffs allege that Deputy Sampson had a duty to follow all applicable road rules and act reasonably during his pursuit of Mr. Thacker, and as a result of engaging in conduct below the standard of reasonable care, Mr. Thacker collided with another vehicle and proximately caused Mr. Schulze's death. (ECF No. 6 at 7.) The DCSO's Vehicle Operation Policy states that "all emergency vehicle operations shall be conducted in strict accordance with NRS 484B.700." (ECF No. 45-10, 9.460 Vehicle Operation – Emergency.) NRS 484B.700 permits a driver of an emergency vehicle to disregard certain rules of the road, including running stop signs, exceeding speed limits, and disregard regulations governing direction of movement or turning in specified directions, so long as the driver operates the vehicle with due regard for safety. NRS 484B.700(1)(a)-(c). This creates a duty. *See Glover-Armont*, 426 P.3d at 54.

DCSO's Vehicle Pursuit Policy, while discretionary, offers guidance on what would be considered a pursuit conducted with "due regard for safety" while acknowledging that "the facts and circumstances of a particular situation may require a different response." (ECF No. 36-4 at 1, 9.465 Vehicle Pursuit.) Specifically, Plaintiffs cite to five conditions under which a pursuit "will be immediately terminated," most relevant being: 1) when the suspect's identity is known and there is no immediate threat to the safety of human life; 2) when the

12

primary officer loses visual contact with the suspect for an extended period of time; and 3) when the pursuit creates a clear and unreasonable danger to human life. (*Id.* at 3.)

Additionally, the DCSO Vehicle Operation Policy states that deputies conducting a Code Three emergency response "shall not: 1) overtake another vehicle on the right; 2) exceed a speed which may expose himself or others to injury; 3) travel in close proximity of another vehicle operating Code Three; 4) operate Code Three after the call no longer requires an emergency response; 5) disobey any traffic law which would be likely to result in any damages to property or injury to persons; 6) violate the Emergency Vehicle Operation provision of the Nevada Revised Statute which authorizes Code Three operations under limited conditions." (ECF No. 45-10, Vehicle Operation – Emergency 9.460(II)(C).)

Plaintiffs argue that viewing the evidence in the light most favorable to them, a reasonable jury could find that Deputy Sampson breached his duty to drive with due regard and avoid reckless disregard by pursuing Mr. Thacker at "extreme speeds" through a residential area and continuing the pursuit through periods of losing visual contact and Mr. Thacker's own wrong-way and unsafe driving. (ECF No. 45 at 25.)

Deputy Sampson pursued Mr. Thacker through a residential neighborhood at speeds exceeding sixty miles per hour despite being off duty and knowing that Mr. Thacker was only wanted on an Oregon parole violation. (ECF No. 36-2 at 2; 45-4 at 29.) Deputy Sampson claims that he saw Mr. Thacker force a car off the road with his reckless driving but still continued with his chase. (ECF Nos. 45 at 18, 36-2 at 2.) Finally, although he stated that he only began his pursuit of Mr. Thacker to alert his supervisors to his location, he did not communicate with dispatch until after Mr. Thacker had already rolled the Jeep the first time. (ECF No. 45-7 at 00:20-24.)

The Court acknowledges that Deputy Sampson's emergency driving

13

decisions were expressly permitted by NRS 484B.700. Plaintiffs' expert David Munday does not conclude that Deputy Sampson violated NRS 484B.700, despite reviewing the statute as part of his expert analysis. (ECF No. 45-9 at 3.) Plaintiffs cite moments where Deputy Sampson lost sight of Mr. Thacker's vehicle, but do not have any evidence to suggest that it was for an "extended period of time." The pursuit itself only lasted approximately five minutes. (*See* ECF No. 36-2 at 2; ECF No. 45-19 at 01:15-21.) It is also undisputed that Deputy Sampson activated his lights and sirens, though Plaintiffs dispute at what moment. (ECF No. 45 at 15.) On body-worn camera footage, Deputy Sampson is also heard saying that there is "no traffic" and only "one car in front" of the pursuit. (ECF No. 45-19 at 01:00-:07.)

Plaintiffs point to a 911 call by Russ Markman claiming that "a bunch of sheriffs and emergency vehicles" nearly forced him and five other cars off the road. (ECF No. 45-17 at 0:10-0:18.) Mr. Markman's call only identifies the cars as "going up through the Ranchos." (*Id.* at 0:05-07.) This call does not clearly identify a location or whether Deputy Sampson was even present in that group of cars. Neither Deputy Sampson nor Mr. Thacker claim that there were multiple sheriffs and emergency vehicles in close proximity at the time of the fatal crash.

Plaintiffs also suggest that Deputy Sampson somehow violated internal DCSO policy by citing to a conversation between Deputies Brown and Oakes remarking on their own route and speed to meet Deputy Sampson. (ECF No. 45-19 at 04:53.) Two deputies en route to support another officer who was engaged in a high-speed chase bears little relation to the decisions of an officer engaged in the pursuit itself.

Viewing the evidence in the light most favorable to Plaintiffs, whether Deputy Sampson breached his duty to drive with due regard for the safety of others is a fact issue for a jury to decide.

14

### c. **Negligent Infliction of Emotional Distress**

Nevada state law allows for an individual to recover for negligent infliction of emotional distress ("NIED") when they are a bystander or a direct victim of negligence on the part of the tortfeasor. *Shoen v. Amerco, Inc.*, 896 P.2d 469, 477 (Nev. 1995). "For a plaintiff to recover for emotional distress caused by witnessing harm to another the plaintiff must prove the defendant's negligent conduct was the proximate cause of the harm to the victim." *State v. Eaton*, 710 P.2d 1370, 1376 (Nev. 1985). The emotional injury must be reasonably foreseeable. Courts evaluate three factors for this inquiry and a plaintiff must show she was: "1) closely related to the victim of an accident, 2) [ ] located near the scene of the accident, and 3) suffer[ed] a shock resulting from direct emotional impact stemming from the sensory and contemporaneous observance of the accident." *Crippens v. Sav on Drug Stores*, 114 Nev. 760 (1998) (citing *Eaton*, 710 P.2d at 1377-78). Sensory and contemporaneous observance does not require visual perception. *Derzaph v. Wynn Las Vegas, LLC*, 2016 WL 1952314, at *2 (D. Nev. May 3, 2016.)

Ms. Schulze cannot recover under the bystander theory because she did not contemporaneously observe the accident. In her call with Detective Torres, she estimates that she called Mr. Schulze immediately before the Jeep's first roll-over at 4:43 PM. (ECF No. 45-22 at 09:00-02.) After hearing her husband yell, the phone cut out. (ECF No. 36-5 at 6.) The fatal crash did not occur for another three minutes. In *Derzaph*, the court favorably cited *Ra v. Superior Court*, 154 Cal. App. 4th 142, 150-151 (2007) granting summary judgment to defendants on an NIED claim. There, although the victim's wife heard the sound of a large overhead sign falling on her husband's head, and moments later saw him on his knees grasping his head in pain, she failed to establish an NIED claim because she did not perceive (by seeing or hearing) the infliction of injury. *Ra*, 154 Cal. App. 4th at 150-151. Because Ms. Schulze "failed to perceive the infliction of the

injury," and only observed the consequences of the crash, summary judgment on her NIED claim must be granted for Defendants.

d. **Plaintiff Victoria Martin's Standing**

Nevada's wrongful death statute only permits the "heirs" of the decedent and the decedent's personal representative to maintain an action for wrongful death. NRS 41.085. For purposes of the statute, "heirs" are those who could inherit under intestate succession. *Id.* Stepchildren who are not legally adopted do not qualify under this definition. Plaintiffs propose that Victoria Martin should still have standing to maintain an action under Nevada's wrongful death statute under a theory of equitable adoption. Ms. Martin is Mr. Schulze's stepdaughter through his marriage to Ms. Schulze. (ECF No. 36-1.) She has been raised by him since she was two years old, and he is who she has "always viewed as [her] dad." (*Id.*)

The doctrine of equitable adoption in Nevada originated as an equitable remedy to enforce an adoption agreement "where there is a promise to adopt, and in reasonable, foreseeable reliance on that promise a child is placed in a position where harm will result if repudiation is permitted." *Nguyen v. Boynes*, 396 P.3d 774, 777 (Nev. 2017) (citing *Frye v. Frye*, 738 P.2d 505, 506 (Nev. 1987). In *Bower v. Landa*, the Supreme Court of Nevada found "no justification for refusing to extend the principles of equitable adoption so as to entitle the subject thereof to maintain an action for the wrongful death of his adoptive parents." 371 P.2d 657, 661 (Nev. 1962). A district court's application of the equitable adoption doctrine is a question of law. *Nguyen*, 396 P.3d at 777.

Plaintiffs have not shown that Mr. Schulze ever promised to adopt Ms. Martin or expressed an intention to enter into an agreement to do so. *See Sargeant v. Sargeant*, 495 P.2d 618, 623 (Nev. 1972) (even where "evidence of the husband's affection for the child is manifold . . . in the absence of even an unfulfilled promise to adopt, the doctrine of equitable adoption cannot apply).

The Court therefore finds that the doctrine of equitable adoption is not available to Victoria Martin.

## IV.   CONCLUSION

It is therefore ordered that Defendants' Motion for Summary Judgment (ECF No. 36) is GRANTED IN PART as it relates to Plaintiff's claims under section 1983 against Defendants Douglas County and Deputy Sampson and Victoria Martin's standing to maintain a wrongful death claim under Nevada state law.

It is further ordered that Defendant's Motion for Summary Judgment (ECF No. 36) is DENIED IN PART as it relates to Plaintiff's claims for wrongful death under Nevada state law against Defendant Deputy Sampson.

Dated this 30th day of March, 2026.

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE